## Bitle's Petition

330

*Mervin J. Brenner*, for petitioners.

*Charles J. Biddle*, protestant p. p.

ALESSANDRONI, J., July 10, 1945.—Abraham Bitle and his wife, Celie, have filed a petition to have their names changed under the provisions of the Act of April 18, 1923, P. L. 75, 54 PS §1. They have complied with the formal requirements of the act as to residence and have submitted satisfactory proof of publication of notice of the filing of the petition as well as an official judgment search showing there are no unsatisfied judgments, etc., of record against them. Petitioners would like to be known hereafter as Abraham Biddle and Celie Biddle. The declared reason for the change is that they "are subjected to great inconvenience and embarrassment by reason of the difficulty of the spelling of their name and the pronunciation thereof, for which reasons they desire to change their name from Bitle to Biddle". "More particularly, the name Bitle and Biddle among the business and social circles of petitioners is the same, and as a result petitioners' names are continuously misspelled 'Biddle'."

Abraham Bitle, who is a bartender by profession, resides with his wife and minor children, Marvin and Gerald, at 345 Dickinson Street, Philadelphia.

No answer was filed to the petition but, at the hearing, Charles J. Biddle, Esq., appeared in propria per-

sona to object to the granting of the petition for the following reasons: (*a*) that "Bitle" is no more difficult to spell or pronounce than "Biddle" and that it is not the real reason for the change of name; (*b*) that a person will not be permitted to take another name just because he happens to prefer it; (*c*) that a change of name which conceals the origin and race of petitioner should not be permitted; (*d*) that the real reason is probably that petitioners wish to Anglicize their name and in so doing adopt one which they feel may bring to them some standing which they themselves have had no part in creating.

Petitioners respond that the 1935 City Directory lists some 175 persons bearing the name "Biddle" living in all sections of Philadelphia and following occupations from that of broker, lawyer to clerk, dressmaker, plumber, chauffeur, and junk dealer.

### Discussion

The Act of April 18, 1923, supra, defines the province of the court as follows (sec. 3) :

"At the hearing of said petition, any person having *lawful objection* to the change of name may appear and be heard. If the court be satisfied after said hearing that there is *no lawful objection* to the granting of the prayer of said petition, a decree *may* be entered by said court changing the name as prayed for. . . ." (Italics supplied.)

It has been said that the authority thus vested in the court is discretionary: Weinstein's Petition, 35 D. & C. 227 (1939). If this be so, and we entertain grave doubts as to the legislative intent, the antecedent history of the common law and prior legislation, as well as the possible abuse of the discretion apparently vested, impel us to conclude that the power thus conferred should be exercised sparingly. Clearly, if a "lawful objection" is raised in opposition to a petition, the prayer thereof should be denied. However, articulating

the discretion which is purportedly granted by the use of the word "may" in the act, we must conclude that even if there be "no lawful objection" to the petition, it would still be within our unlimited and unrestricted power to deny the prayer. Otherwise, "discretion" is but an idle and futile label. We may well ponder the validity of the considerations which would not constitute a "lawful objection" and would nonetheless suffice to move the court to deny a requested change of name. Little help is derived from the cases wherein a requested change has been denied, because, although couched in language of discretion, in fact, however, other and substantial grounds for the denial of the petition were present: Weinstein's Petition, supra; Rounick's Petition, 47 D. & C. 71 (1942) ; De Renzo's Petition, 44 D. & C. 699 (1942). If the discretion indicated by the use of the word "may" was intentional, it should be exercised with due restraint if the pitfalls of prejudice, taste, or whim would be avoided.

Our substantive law has consistently recognized the doctrine that a man may adopt whatever name he chooses for his general dealings or in a given transaction, and he will be bound accordingly: Coltun v. Getz, 97 Pa. Superior Ct. 591 (1929). By the ancient common law, because of the relationship between Church and State, it was held that "a man cannot have two names of baptism as he may have divers surnames": 2 Coke's First Institute, p. 178 (Thomas' Ed. 1836). The interesting history of that doctrine is reviewed in an able opinion by Hayes, P. J., cited in Myer v. Fegaly, 39 Pa. 429 (1861). No similar limitation as to change of given name or surname was carried over into our law. In the case of Imhoff v. Fleurer, 2 Phila. 35 (1856), Hare, J., said (p. 36) :

"In this country, where men of different races and tongues are constantly mingling in business transactions, in ignorance of the peculiarities which mark the pronunciation of the same letters in their respective

languages, and where names have no higher sanction than the will of those who give and those who bear them, a liberal rule should prevail, suited to the exigencies of the situation, which differs essentially from that of the inhabitants of those countries where the State prescribes and enforces the use of baptismal registers, and regards the appellations conferred by the ministers of religion as legally binding". See also In re Ross' Contested Election, 21 D. & C. 57 (1934).

The Act of April 9, 1852, P. L. 301, which apparently was the first legislative enactment of its kind in this Commonwealth, was construed in Laflin & Rand Powder Co. v. Steytler et al., 146 Pa. 434 (1891). That act, like the Act of April 18, 1923, declared "That it shall be lawful for the courts of common pleas of any county of this Commonwealth to make a decree changing the name of any person resident in said county." It differed from the act here involved in that it provided for publication of the decree, "after the same shall be made", rather than for publication of notice of the filing of the petition for change of name. In the Laflin case, supra, the court held that the Act of 1852 "was in affirmance and aid of the common law, to make a definite point of time at which a change shall take effect".

By the Act of July 9, 1919, P. L. 822, 54 PS §5, the assumption of a new name without court approval was declared unlawful and the omission of the court proceeding, previously provided by the Act of 1852, "for purpose of avoiding payment of taxes or debt", was declared a misdemeanor. Thus, to the power vested in the courts to formalize the change of name was added a criminal sanction when an unauthorized change was effected for an unlawful purpose.

The Act of 1923 did not disturb the Act of 1919; it modified the procedure to be followed under the Act of 1852 and incorporated (by section 4) the amendatory provision of the Act of April 15, 1859, P. L. 673, whereby a new name, adopted by a parent, shall inure

to the benefit of a minor. When, therefore, the Act of 1923 referred to "lawful objection" to a change of name, what was clearly contemplated was a change of name effected for the fraudulent purpose of avoiding payment of taxes or for other fraudulent purpose such as was specifically declared a misdemeanor under the Act of 1919. The publication of the petition in advance of the change of name, rather than the publication of the decree subsequent thereto, implemented the Act of 1919 so as to prevent an imposition and fraud upon the court.

The objections presently raised in our opinion do not suffice to bar this petition. Assuming it be true that the proposed change "conceals the race and origin of the petitioner", men may quarrel with the moral or ethical implications of such action, yet there is nothing unlawful in it. No matter what our personal conviction as to the avowed reasons for the change, we are not called upon to adjudicate the propriety of such a purpose nor will we usurp that power. The moral implications must remain to be resolved by petitioners and their own consciences. The charge that petitioners "wish to Anglicize their name" may do violence to the concept of cultural pluralism, but the functions of a judicial tribunal under our laws have not been extended so as to warrant a determination which will superimpose one cultural concept upon another. Finally, while we find much to admire in the loyalty to an honorable family name and tradition, we cannot acknowledge to the objector such a proprietary interest in his family name (which he himself concedes), as to prohibit a change which, even without the Act of 1923, falls so clearly within the doctrine of idem sonans: Paul v. Johnson, 9 Phila. 32 (1871) ; Myer v. Fegaly, supra.

### Decree

And now, to wit, July 10, 1945, upon hearing of the within petition and upon motion of Mervin J. Brenner,

Esq., attorney for petitioner, and upon proof of publication of the notice as required by the order of this court, together with proof that there are no judgments or decrees of record or any other matter of like character against petitioner, and it appearing that there is no lawful objection to the granting of the prayer of the petition, it is ordered and decreed that the name of petitioners be and it is hereby changed to Abraham Biddle and Celie Biddle, in accordance with the act of assembly in such cases made and provided.